UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RAFFI BARSOUMIAN, M.D.,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                              06-CV-831S

UNIVERSITY AT BUFFALO, THE STATE
UNIVERSITY OF NEW YORK SCHOOL OF
MEDICINE AND BIOMEDICAL SCIENCES,
UNIVERSITY MEDICAL RESIDENT SERVICES,
P.C., ROSEANNE BERGER, M.D., JAMES
HASSETT, M.D., ROGER SEIBEL, M.D.,

                              Defendants.

## I.  INTRODUCTION

Plaintiff Raffi Barsoumian, M.D., commenced this action in November 2006 seeking injunctive relief and damages for Defendants' failure to reinstate him in a medical residency program after he successfully grieved the non-renewal of his employment agreement. Pending before this Court are the Motion for Summary Judgment of Defendant University Medical Resident Services, P.C. ("UMRS"), the Motion for Summary Judgment of Defendants Roseanne Berger, M.D., and James Hassett, M.D., and Plaintiff's Motion for Partial Summary Judgment.  These motions are fully briefed and the Court finds oral argument unnecessary. For the reasons that follow, UMRS' motion is denied, the motion of Defendants Berger and Hassett is granted in part and denied in part, and Plaintiff's motion for partial summary judgment is also granted in part and denied in part.

1

## II. BACKGROUND

**A.      Factual Background**

Plaintiff was admitted to the Surgical Residency Program of University at Buffalo,

the State University of New York School of Medicine and Biomedical Science ("UB"), in

March 2002.  (Complaint, Docket No. 1-4, ¶¶ 22-23; Declaration of James Hassett, M.D.,

Docket No. 80, ¶ 9).  The post-graduate training program for a general surgery resident is

typically five years in length, with those training years denominated as PGY1, PGY2,

PGY3, PGY4 and PGY5.  (Comp. ¶ 9; Hassett Decl. ¶ 5).  During each year a surgical

resident is required to participate in several hospital rotations. (Compl. ¶ 10; Hassett Decl.

¶¶ 6, 10).  UB does not operate its own teaching hospital, but provides the necessary

rotations for residents by entering into Affiliate Agreements with area hospitals, including

Erie County Medical Center Corporation ("ECMC") and Kaleida Health.  (Declaration of

Defendant Roseanne Berger, M.D., Docket No. 81, ¶¶ 8-10).

Plaintiff signed a Residency Employment Agreement with UMRS, initially for the

2002-2003 PGY1 year, but subject to successive renewals. (Compl. Ex. A (employment

agreement)).   The UB Probation and Dismissal Policy requires that non-renewal of the

employment agreement be based upon the same criteria established for dismissal.

(Compl. Ex. B).  Dismissal "may be considered for residents who fail to be removed from

probation" if the residents were first informed in writing of their performance problems,

"given the opportunity to remediate their deficiencies, and provided feedback on their

efforts."  (Compl. Ex. B).  Automatic dismissal may also result based upon a resident's

"[f]ailure to comply with the bylaws and applicable rules, regulations, and procedures at

2

each [UB] affiliated hospital as outlined in the employment contract." Compl. Ex. B. Plaintiff's employment agreement also incorporates by reference, among other things, the Employees' Grievance Procedure and the policy on sexual harassment.  (Id. at 4).

In June 2004, shortly after the commencement of Plaintiff's PGY3 year, Plaintiff was placed on probation for six months as a result of his "continued unprofessional behavior." (Hassett Decl. ¶¶ 18, 20-21; Compl. ¶ 43).   While on probation, Plaintiff received unsatisfactory evaluations on two of his trauma rotations at ECMC, and various concerns were raised throughout the probationary period by faculty regarding Plaintiff's professionalism, clinical ability, and honesty.  (Hasset Decl. ¶ 25-35, Ex. D; Compl. ¶ 44). At the end of his probationary period, Plaintiff was informed that the ECMC surgical faculty had expressed reservations about allowing Plaintiff to return to that facility for completion of the rotations that he had failed to complete satisfactorily.  (Hassett Decl. ¶¶ 35-36; Pl's St. Undisputed Facts, Docket No. 84, ¶ 29).  Nonetheless, Plaintiff was taken off probation and restored to "good standing," purportedly due to his completion of the educational enhancement process. (Hasset Decl. ¶ 36 Ex D.; Pl's St. Undisputed Facts ¶ 30).  Days later, by letter dated January 18, 2005, Defendant James Hassett, M.D., the Residency Program Director, informed Plaintiff that he would be recommending termination of Plaintiff's training at the end of the academic year because of the observations and concerns of the faculty.  (Hassett Decl. ¶¶ 1, 37; Pl's St. Undisputed Facts ¶ 31-35).

On February 4, 2005, Hassett was informed by Defendant Roger Siebel, M.D., that, despite having reservations, the consensus of the ECMC staff was to allow Plaintiff to return "and try to remediate him."  (Hassett Decl. ¶ 39-40, Ex D; Pl's St. Undisputed Facts ¶ 38).  Hassett asserts that "this confirmation was of no value" at that time, in part because

3

Plaintiff could not remediate his trauma rotation at ECMC until after he completed the remaining required PGY3 rotations.  (Hassett Decl. ¶ 40).  On February 7, 2005, at a meeting which also constituted a Level I grievance meeting, the Executive Committee of the Department of Surgery agreed with the recommendation not to renew Plaintiff's training contract. (Hassett Decl. ¶ 41; Pl's St. Undisputed Facts ¶ 37, 39, 41).  Plaintiff requested a Level II grievance hearing and, on July 12, 2005, the Level II Grievance Committee upheld the decision not to renew.  (Compl. ¶¶ 66-67; Hassett Decl. ¶ 48 Ex D).

Plaintiff then requested and was granted a Level III review of the non-renewal decision, and a hearing was held on October 31, 2005.  (Compl. ¶ 68; Hassett Decl. ¶ 49). During the hearing, the Level III Grievance Committee questioned why Plaintiff was determined to have successfully completed probation when he received two unsatisfactory evaluations.  (Hassett Decl. Ex. OO).  As reflected in the grievance decision, Hassett asserted that this was done to allow Plaintiff to apply to other programs while completing his PGY3 year in good standing.  (Hassett Decl. Ex. OO).  The Level III Committee found that because Plaintiff's "removal from probation could reasonably be construed to imply that [Plaintiff] successfully remediated all issues, . . . the decision[] to then notify him of a non-renewal of his contract [was] inappropriate."  (Id.). Although the "process of non-renewal decision making was flawed," the committee noted that its decision did not "imply, in either a positive or negative fashion, that the information contained within [Plaintiff's] file regarding [his] professionalism either supports or negates this conclusion."  (Id.).

Plaintiff was restored to payroll in November 2005 and received back pay from June 2005.  (Compl. ¶ 71; Hassett Decl. ¶ 50).  Although Hassett objected internally to the Level III determination (Affirmation of Andrew P. Fleming, Esq., Docket No. 83, Ex. W), he "tried

to clarify whether Plaintiff could indeed return" to ECMC or the Women and Children's Hospital of Buffalo ("WCHB"), a Kaleida Health hospital at which Plaintiff participated in rotations during the spring of 2005. (Hassett Decl. ¶¶ 51-52). According to Hassert, these are the only two UB affiliated hospitals at which the PGY3 trauma and pediatric assignments Plaintiff has not yet completed are available. (Hassett Decl. ¶ 65). At issue with Kaleida Health was a pending sexual harassment claim against Plaintiff for his conduct at WCHB, and Hassett therefore inquired as to whether Plaintiff would be allowed to return for training. (Hassett Decl. ¶¶ 51-53 Ex RR; see Docket No. 76 Exs. N, O). Following an investigation, Kaleida Health staff determined that there was probable cause to conclude that Plaintiff engaged in several inappropriate actions of a sexual nature in violation of Kaleida Health's Unlawful Harassment Policy, and Kaleida Health informed UB in June 2005 that Plaintiff's removal to another clinical assignment was warranted. (Docket No. 76 Exs. N, O). By letter dated February 20, 2006, Kaleida Health again asserted to Defendant Roseanne Berger, Senior Associate Dean for Graduate Medical Education at UB that it did not welcome Plaintiff's presence as a resident and requested that Plaintiff not be assigned to any rotations at a Kaleida Health hospital. (Docket No.76, Ex M).

Similarly, on December 14, 2005, the ECMC surgical staff unanimously voted in Hassett's presence to not allow Plaintiff back for remediation. (Hassett Decl. Exs. TT, WW). Defendant Berger sent Plaintiff a letter dated February 21, 2006, informing Plaintiff that "UB affiliated hospitals advised the UB Office of Graduate Medical Education that they cannot commit to provide you access to their sites for continued residency training." (Docket No. 83 Ex. CC). ECMC correspondence also dated February 21, 2006, however, indicates the organization's understanding that Plaintiff "was removed from the Residency

5

Program by [UB] and has not been reinstated.  In the event [Plaintiff] is reinstated,

[Defendant Seibel] can initiate a request for corrective action." (Hassett Decl. Ex WW).  In

light of this, Hassett drafted a letter to Plaintiff indicating that training could be facilitated

at ECMC, however, he was directed not to send the message by ECMC's chief executive

officer, Michael Young. (Hassett Decl. ¶¶ 58-59 Ex YY).  Young's email, dated February

24, 2006, stated that "your legal staff needs to work with our lawyer to understand our

position.  You may not comment on any action or position ECMC may or may [not] take in

any situation."  (Hassett Decl. Ex YY (capitalization removed)).

Plaintiff was never returned to residency training, and on July 26, 2006, he was

removed from UMRS payroll.  (Pl's Statement Undisputed Facts ¶ 64).

## B.    Procedural Background

Plaintiff commenced the instant action in New York State Supreme Court, Erie

County, by filing an Order to Show Cause for Preliminary Injunction and a Summons and

Complaint. In his Complaint, he asserted five causes of action alleging that (1) Plaintiff is

entitled to preliminary injunctive relief enjoining Defendants from refusing to reinstate him;

(2) Defendants Berger, Hassett, and Seibel deprived him of his Fourteenth Amendment

Due Process rights in violation of 42 U.S.C. § 1983; (3) Defendants University of Buffalo

and UMRS breached the employment contract; (4) Defendants Berger, Hassett, and Seibel

tortiously interfered with Plaintiff's existent contractual relationship; and (5) Defendants

Berger, Hassett, and Seibel tortiously interfered with Plaintiff's prospective economic

advantage. (Compl. ¶¶ 80-120). UMRS removed the action to this Court shortly thereafter,

asserting federal question jurisdiction. (Notice of Removal, Docket No. 1, ¶ 5).

UMRS (Docket No. 8) and the UB Defendants  (Docket No. 4) filed separate

6

Motions to Dismiss.  In a March 11, 2009 Decision and Order, at which time this Court also considered Plaintiff's Motion for a Preliminary Injunction (Docket No. 19), the Complaint was dismissed as to UB on the ground of Eleventh Amendment immunity.  (Docket No. 43 at 6).  For the same reason, the second, fourth and fifth causes of action were dismissed against Defendants Hassett, Seibel and Berger insofar as it sought monetary damages against those defendants in their official capacities. (Id.).  This Court denied Plaintiff's Motion for a Preliminary Injunction, and dismissed the cause of action in the Complaint seeking the same, because, among other things, Plaintiff failed to establish that he would suffer irreparable harm absent immediate relief. (Id. at 11-12).  This Court also rejected Defendants' argument that ECMC and Kaleida Health were required parties pursuant to Rule 12 (b)(7). (Id. at 7-8).

On October 6, 2009, a Statement Noting Death was filed indicating that Defendant Roger Seibel, M.D., passed away on February 13, 2007.  (Docket No. 53).  Plaintiff failed to move for substitution of Seibel's estate as defendant within 90 days after service of this statement, therefore any claims against Seibel must be dismissed pursuant to Fed. R. Civ. P. 25 (a)(1).  Plaintiff appears to concede this, inasmuch as no reference to claims against Seibel appears in his current motion papers.  Defendants now move for summary judgment dismissing the complaint as against each of them (Docket Nos. 76 (UMRS)[1]; 78

---

[1]In support of its Motion for Summary Judgment (Docket No. 76), Defendant UMRS submitted a Statement of Undisputed Facts (Docket No. 76-1), a supporting Memorandum of Law (Docket No. 76-2) with Exhibits A-Z (Docket Nos. 76-3 to 76-5).  Plaintiff opposed this motion with the affirmation of Andrew P. Fleming, Esq., and Exhibits A-Q (Docket Nos. 94, 94-1 to 94-3), Declaration of Plaintiff Raffi Barsoumian, M.D. (Docket No. 94-4), an opposing Memorandum of Law (Docket No. 94-5), and Objections to UMRS' Statement of Undisputed Facts (Docket No. 94-6).  UMRS filed a reply Memorandum of Law (Docket No. 98).

(Defendants Hassett and Berger)[2]).  Plaintiff moves for partial summary judgment on liability for his second and third causes of action, and also seeks specific performance of his employment agreement in the form of reinstatement. (Docket No. 83).[3]

## III.  DISCUSSION

Summary judgment is appropriate where the materials in the record, including depositions, documents, affidavits or declarations, and stipulations, show that there are no genuine issues regarding any material fact and that the movant is entitled to judgment as a matter of law.  see FED.R.CIV.P. 56 (a), (c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A.    Plaintiff's Third Cause of Action for Breach of Contract

Plaintiff alleges that UMRS breached Plaintiff's employment agreement by refusing

---

[2]In support of their Motion for Summary Judgment (Docket N. 78), Defendants submitted a Statement of Undisputed Facts (Docket No. 79), the Declaration of Defendant James Hassett, M.D., with Exhibits A-DDD (Docket No. 80), the Declaration of Roseanne Berger, M.D., with Exhibits A-X (Docket No. 81), and a supporting Memorandum of Law (Docket No. 82).  Plaintiff opposed the motion with the Fleming Affirmation and Exhibits, Plaintiff's Declaration (Docket No. 94-4), an opposing Memorandum of Law (Docket No. 94-7), and Objections to Defendants' Statement of Undisputed Facts (Docket No. 94-8). Defendants submitted the Reply Declaration of Kim S. Murphy, Esq. (Docket No. 99).

[3]In support of his Motion for Partial Summary Judgment (Docket No. 83), Plaintiff submitted the Fleming Affirmation and Exhibits (Docket No. 83), Statement of Undisputed Facts (Docket No. 84), Plaintiff's Affidavits (Docket Nos. 85, 88), and a supporting Memorandum of Law with Attachments 1-7 (Docket No. 86).  Defendants Hassett and Berger responded with the Declaration of Delia D. Cadle, Esq. (Docket No. 91) and Objections to Plaintiff's Statement of Undisputed Facts (Docket No. 92).  UMRS also responded with an opposing Memorandum of Law with one attachment (Docket No. 93).  Plaintiff replied with his own affidavit (Docket No. 101), a reply Memorandum of Law against UMRS with Exhibits A-E (Docket No. 101-1 & 101-2) and a reply Memorandum of Law against Defendants Berger and Hassett with Exhibits A-F (Docket No. 101-3 & 101-4).

to follow grievance procedures, refusing "to adhere to the 'binding' determination of the Level III Review Committee which required Plaintiff's timely [reinstatement]," and "unjustly depriving Plaintiff access to UB affiliated hospitals."  Compl. ¶¶ 100-106.  UMRS argues that it is entitled to summary judgment because Plaintiff failed to exhaust administrative remedies by either (1) requesting a Level II Grievance hearing with respect to the sexual harassment charge against him at the Kaleida Health facility (UMRS Mem. of Law, Docket No. 76-3, at 10-11); or (2) filing a complaint with the New York State Public Health Council "in order to regain or retain privileges as a physician" at ECMC and Kaleida Health. (UMRS' Mem of Law at 15).  In order for either of these arguments to be colorable, however, this Court must first accept the asserted premise that ECMC and Kaleida Health are the only facilities where Plaintiff can participate in the required remediation training, and both those facilities have categorically and, within the context of the Affiliation Agreements, permissibly precluded Plaintiff.  In other words, as this Defendant recognizes (UMRS Mem of Law in Opp'n, Docket No. 93, at 8-11; UMRS Reply Mem of Law, Docket No. 98, at 2), UMRS must first establish its defense that performance in compliance with the employment agreement was impossible through no fault of its own. See Pleasant Hill Dev., Inc. v. Foxwood Enters., LLC, 65 A.D.3d 1203, 1206 (N.Y. App Div 2d Dep't 2009), lv dismissed 15 N.Y.3d 874 (N.Y. 2010)(performance is excused where fulfillment of contractual obligation is rendered impossible by unforeseeable events)

"The vitiation of a contract based upon impossibility of performance is rarely imposed and will be applicable only in those circumstances 'when the destruction of the subject matter * * * or the means of performance makes performance objectively impossible. Moreover, the impossibility must be produced by an unanticipated event that

9

could not have been foreseen or guarded against in the contract' " Lagarenne v. Ingber,

273 A.D.2d 735, 737 (N.Y. App Div 3d Dep't 2000), quoting Kel Kim Corp. v. Central Mkts.,

70 N.Y.2d 900, 902 (N.Y. 1987).   As this Court previously found in its decision on the

Motions to Dismiss, the evidence proffered by Defendants indicates that ECMC has not

yet reached a decision regarding Plaintiff's return to its facility. (Docket No. 43 at 9).   The

summary judgment submissions similarly establish that Plaintiff has not yet been removed

or withdrawn from ECMC within the meaning of the applicable Affiliation Agreement.   The

limited excerpts of the Affiliation Agreements submitted to this Court provide that ECMC

and Kaleida Health "*shall accept* all Residents who are assigned by the University."

(Hassett Decl. Exs. B (Kaleida Health) and C (ECMC) (emphasis added)).   These

agreements delineate responsibility for the discipline of residents by providing that:

> Residents who fail to conform to the policies, By-laws, rules and regulations
> of ECMC, or who are unacceptable to ECMC for any reason involving patient
> safety or well-being or the operation of ECMC, may be removed from
> ECMC's premises and shall be reported by ECMC to the Residency Program
> Director and the Office of Graduate Education at the Medical School or at the
> Dental School for any appropriate corrective action in accordance with
> University rules, ACGME/CODA guidelines and subject to the terms of any
> applicable collective bargaining agreements.   Any Resident so removed or
> withdrawn shall not be reassigned by the University to ECMC without the
> prior written consent of the CEO or his/her designee and the Program
> Director.   If a Resident has been reported to and subject to corrective action
> by the Office of Graduate Medical Education at the Medical School
> [("OGME")]or at the Dental School for corrective action by a hospital other
> than ECMC, and such Resident is scheduled to serve a rotation at ECMC,
> the University shall inform ECMC of the nature of the corrective action and
> the reasons therefor, subject to any applicable confidentiality laws or
> regulations.

(Docket No. 76-5, Ex G (ECMC), Ex H (Kaleida Health)).   There is no dispute that Plaintiff

failed to satisfactorily complete two surgical rotations at ECMC and that ECMC faculty have

consistently expressed serious reservations with respect to allowing Plaintiff to return.

(Hassett Decl. ¶¶ 25-35, Exs. TT, WW).  Nonetheless, ECMC's chief medical officer stated that "a request for corrective action" could be made "in the event that [Plaintiff] is reinstated."  Hassett Decl. Ex. WW.  Further, contrary to the assertion that Plaintiff's return to ECMC was "emphatically nixed" by ECMC's CEO, (UMRS Reply Mem of Law, Docket No. 98, at 2), the email from Michael Young states that "your legal staff needs to work with our lawyer" and directs Hassett not to comment on any position ECMC "may take," not a position that entity had already taken.  (Hassett Decl. Ex. YY).  Defendant Berger even asserts in her declaration that, based upon her conversations with ECMC staff, ECMC "had not made a decision about being able to take Plaintiff back." Berger Decl., Docket No. 81, ¶ 34.  Accordingly, Plaintiff has not yet been "reported to" the OGME by ECMC such that he would be "subject to corrective action" within the terms of the Affiliation Agreement. Docket No. 76-5, Ex G.  Because Plaintiff has not yet been removed from ECMC in conformance with the Affiliation Agreement, then contrary to UMRS' contention, there is not yet an obligation to obtain the written consent of ECMC's CEO before reassigning Plaintiff to that facility. (Hassett Decl Ex. B (ECMC "shall accept all Residents").  The fact that ECMC may at a future date choose to invoke the right to remove Plaintiff out of consideration for patient safety or the well-being of ECMC's operations is of no relevance to the issue of whether Plaintiff could be assigned to ECMC in the first place.  see Kel Kim Corp., 70 N.Y.2d at 902 (a contracting "party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome").  UMRS does not dispute that an obligation to abide by the grievance determination and reinstate Plaintiff exists, and this Court concludes that it has failed to establish its defense that performance of that obligation was impossible.  Accordingly, that part of Plaintiff's motion

11

seeking partial summary judgment with respect to UMRS' liability for breach of contract is granted.

It is therefore unnecessary for this Court to consider UMRS' exhaustion arguments,. In any event, because the resolution of this breach of contract claim does not turn on the propriety of any hospital's factual determination to deny Plaintiff privileges, dismissal due to Plaintiff's failure to file a claim with the New York Public Health Council is unwarranted. Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir. 1996)(primary jurisdiction inappropriate where issues of contract interpretation are dispositive); Franzon v. Massena Mem. Hosp., 977 F.Supp. 160, 165-166 (N.D.N.Y. 1997)(primary jurisdiction is invoked when an administrative agency's superior fact find ability would assist in the judicial process).  Similarly, the fact that the grievance process has not yet concluded with respect to Kaleida Health's determination that Plaintiff violated the sexual harassment policy is irrelevant to the present discussion where, based on the parties' submissions, ECMC is still a viable option for placement of Plaintiff.  See Docket No. 76, Ex O.

The question remains as to what relief Plaintiff is entitled at this time.  Plaintiff argues that specific performance - his reinstatement - is warranted in this case because monetary damages alone would be "wholly insufficient." Pl's Mem of Law at 24 (reserving right to seek monetary damages as well).  An order of specific performance may be appropriate where the calculation of monetary damages would be speculative.  Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433, 436 (2d Cir. 1993)(doubts regarding the adequacy of monetary damages should be resolved in favor of specific performance); see Van Wagner Adver. Corp. v. S&M Enters., 67 N.Y.2d 186, 194 (N.Y.

1986)(if damages cannot be calculated with reasonable certainty, then specific performance is warranted).   Such is the case here.   After the Level III Grievance determination in October 2005, Plaintiff was returned to payroll and received back pay and benefits from June 2005, and continued to receive the same until the end of July 2006 despite the failure to be returned to a hospital rotation.  (Pl's Decl., Docket No. 94-4, ¶ 10-11; Pl's St. Undisputed Facts ¶ 64).   By his own admission, Plaintiff has been able to work as a surgical assistant and was accepted by an accredited fellowship in Minimally Invasive Surgery, although he has been unable to secure a position with another surgical residency program.  (Pl's Decl., Docket No. 85, ¶¶ 32-37).   Plaintiff has submitted an Economic Loss Calculation report in which six different damages calculations are offered.  (Fleming Aff. Ex FF).   Each of those calculations, however, is based upon the premise that Plaintiff would become a surgeon if reinstated, necessarily presuming his successful completion of not only his PGY3 year, but the entire residency program.   Such a result is speculative at this juncture.   The Level III Grievance committee's decision was based upon a failure to abide by dismissal procedure, and the decision specifically indicated that the committee was evaluating Plaintiff's professional acumen.   See Fenje v. Feld, No. 01 C 9684, 2002 WL 1160158, *3 (N.D. Ill. May 29, 2002)(plaintiff entitled to damages from procedurally improper termination only if he would not have been terminated but for the irregularities). Instead, the grievance committee recognized that continued probation was appropriate for outstanding issues such as the unsuccessful trauma rotations at ECMC.  (Hasset Decl. Ex. OO).   Accordingly, this Court finds that Plaintiff is entitled to an order directing UMRS to comply with the Level III Grievance determination by reinstating Plaintiff as a PGY3 resident on probation.  This conclusion in no way limits ECMC's rights under the Affiliation

13

Agreement to remove Plaintiff from its facility and report him for corrective action if warranted. Similarly, this conclusion also does not preclude Plaintiff's "[a]utomatic dismissal" pursuant to the applicable dismissal procedures should Kaleida Health's determination that Plaintiff failed to comply with that affiliated hospital's sexual harassment policies be upheld at the conclusion of the grievance procedure. (Compl. Ex. B (Probation and Dismissal Policy)).

### B.    Plaintiff's Second Cause of Action for Violation of 42 U.S.C. § 1983

Following this Court's determination on the prior motions to dismiss (Docket No. 43), Plaintiff's second cause of action remains against Defendants Hassett and Berger in their official capacities insofar as equitable relief is sought, and against them in their individual capacities insofar as monetary damages are sought. Plaintiff alleges that these Defendants deprived him of his protected property interest in his residency position without procedural due process, he was similarly deprived of his liberty interest to be free from "stigmatizing disciplinary action,"[4] and the decision not to renew his employment agreement without affording him an opportunity to remediate the unsatisfactory trauma rotations represented a significant deprivation of Plaintiff's right to substantive due process. (Compl. ¶¶ 85-99). Plaintiff argues that Defendants are liable for these violations under 42 U.S.C. § 1983. Defendants assert that they are entitled to summary judgment because, in addition to the impossibility of performance, the non-renewal of Plaintiff's residency was an academic dismissal for which less stringent procedural safeguards are required, (Def's Mem of Law, Docket No. 82, at 4-9), Plaintiff was afforded more due process than

---

[4]Plaintiff's Motion for Partial Summary Judgment fails to develop the liberty interest argument, and it will not be considered further here.

constitutionally required regardless of whether or not his non-renewal was classified as an academic determination, (Id. at 9-12), and the non-renewal was not arbitrary and capricious.  (Id. at 12-21).  Defendants further argue that even if this Court does find that Plaintiff's due process rights were violated, Defendants are entitled to qualified immunity as any unlawfulness would not have been apparent in light of the less stringent safeguards for academic dismissals.

Initially, Defendants do not dispute that Plaintiff had a constitutionally protected property right not to be terminated from the residency program without procedural due process.  See  Adler v. County of Nassau, 113 F.Supp.2d 423, 431 (E.D.N.Y. 2000)(resident possessed constitutionally protected property right not to be terminated without due process hearing in accordance with terms of the contract).  With respect to Defendants' argument that the non-renewal was purely an academic decision, this Court notes that "[w]hile a medical residency program is largely an academic undertaking, it also is an employment relationship."  Ezekwo v. NYC Health & Hosp. Corp., 940 F.2d 775, 785 (2d Cir. 1991), cert denied 502 U.S. 1013 (1991).  In any event, upon learning of the decision not to renew his residency, Plaintiff was afforded and took advantage of a three-step grievance procedure, which included a hearing before the Level III Grievance committee.  (See Fleming Aff. Ex R). This process would have been sufficient to afford Plaintiff notice and an opportunity to be heard.  See Adler, 113 F.Supp.2d at 431.  Plaintiff correctly argues, however, that such procedures were rendered meaningless by Defendants' failure to abide by the Level III Grievance committee's decision to reinstate

Plaintiff. [5] Adler, 113 F.Supp.2d at 430; Pl's Mem of Law, Docket No. 86, at 11-13.  Further, as concluded above, Defendants have failed to establish that compliance was impossible.[6]

In order to establish a substantive due process claim, Plaintiff must establish that he was deprived of his property right in a manner "so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)(such as a deliberate flouting of the law or racial animus); Adler, 113 F.Supp.2d at 430-431.  Here, although based on this record Defendants erred in failing to restore Plaintiff as a probationary PGY3 resident following the Level III Grievance committee's determination, there is no evidence of conduct "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Southerland v. City of New York, 667 F.3d 87, 112 (2d Cir. 2012)(internal quotation marks omitted).  Indeed, as discussed further below, there is nothing from which to infer that the failure to reinstate Plaintiff resulted from anything other than the mistaken, but reasonable, belief that any attempt to place Plaintiff would be futile.

Plaintiff has therefore established a procedural, but not substantive, violation of due process.  Thus, with respect to this cause of action against Defendants in their official capacity, Plaintiff is, as concluded above, entitled to equitable relief in the form of reinstatement as a PGY3 resident on probation. Board of Educ. of Pawling Central School

---

[5]Plaintiff also argues that the decision to "summarily" remove him from payroll in July 2006 was a further due process violation. (Pl's Mem of Law, Docket No. 86, at 13-14).  Plaintiff fails to establish how he has a protected property interest in continued payment distinguishable from his protected property right in the residency position itself.  This Court will therefore consider only the single violation.

[6]Defendants Berger and Hassett have incorporated by reference all applicable UMRS arguments (Docket No. 99 ¶ 3).

Dist. v. Schutz, 290 F.3d 476, 480 (2d Cir. 2002) (prospective equitable relief against state officials in their official capacity not barred by the Eleventh Amendment).

As a prerequisite to an award of damages against Defendants in their individual capacity, Plaintiff is required to establish that each defendant was personally involved in the deprivation of procedural due process.   Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010).  Defendant Hassett does not dispute that he was responsible for "return[ing] Plaintiff to his clinical rotations," or that he did not do so following the Level III Grievance decision, thus his direct participation in the deprivation is clear. (Hassett Decl. ¶¶ 50, 52; see Pl's Decl. ¶ 11, Fleming Aff. Ex. F).  Defendant Berger, as Senior Associate Dean, oversees all of UB's residency programs. The liability of a supervisor or person in position of authority can be established by "direct participation, or failure to remedy the alleged wrong after learning of it, or . . . gross negligence in managing subordinates." Black v Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  Dr. Berger concedes that she was aware both of the grievance determination and ECMC's indecision regarding Plaintiff, and as such it is arguable that Dr. Berger was in a position to "remedy the alleged wrong after learning of it." Black, 76 F.3d at 74.

Defendants argue that the are entitled to qualified immunity in this case because neither could objectively be said to have known that their actions, or more specifically, inactions were unlawful. This defense "shields a defendant official sued in his individual capacity from liability for civil damages." Frank v. Relin, 1 F.3d 1317, 1328 (2d Cir. 1993), cert denied 510 U.S. 1012 (1993)(internal quotation marks omitted).   The qualified immunity defense reflects the "concern that for the public benefit, public officials be able to perform their duties unflinchingly and without constant dread of retaliation."  Amore v.

17

<u>Novarro</u>, 624 F.3d 522, 530 (2d Cir. 2010). Courts considering the applicability of this defense must consider "whether a reasonable person, acting under the circumstances then confronting a defendant, would have understood that the applicable law was being violated," <u>Vega v. Miller</u>,  273 F.3d 460, 466 (2d Cir. 2001), and whether it was clear that an exception did not exist permitting the challenged action or inaction. <u>Robison v. Via</u>, 821 F.2d 913, 921 (2d Cir. 1987); <u>Reynolds by Reynolds v. Strunk</u>, 688 F.Supp. 950, 956 -957 (S.D.N.Y.1988)  The applicable standard "is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " <u>Amore v. Novarro</u>, 624 F.3d at 530.

As noted above, Defendants do not dispute that the Level III Grievance determination required Plaintiff to be reinstated for the purposes of remediating his unsatisfactory trauma rotations.  The evidence establishes that Defendants took several steps to attempt to comply with this determination.  Plaintiff was immediately restored to payroll and awarded back pay.  Dr. Hassett communicated with ECMC as well as Kaleida Health about placement of Plaintiff, despite Kaleida Health's prior determination that Plaintiff had violated hospital policy.  Dr. Hassett was about to place Plaintiff back at ECMC when he received an email from that facility's CEO directing him not to inform Plaintiff of the placement.  This followed a history of concerns regarding Plaintiff's performance at ECMC, which related to both professionalism and patient care, as well as the violation the sexual harassment policies at Kaleida Health. (See Hassett Decl. ¶¶ 25-35; Pl's St. Undisputed Facts ¶ 29). Although he challenges the merit thereof, Plaintiff does not dispute that ECMC has consistently expressed such concerns or that Kaleida Health has determined the policy violation.  (See e.g. Pl's St. Undisputed Facts ¶¶ 15, 23, 29, 32; Pl's Decl., Docket No. 85, ¶¶ 19, 23). Thus, despite Defendants failure to prove that

reinstatement of Plaintiff was impossible due to the specific terms of the Affiliation Agreement, a person faced with these circumstances would have reasonably concluded that Plaintiff would not be accepted by the affiliated hospitals and any attempt to place him would be futile. See Amore, 624 F.3d at 530. Defendants Hassett and Berger are therefore entitled to summary judgment on Plaintiff's second cause of action as asserted against them in their individual capacities.

### C.      Plaintiff's Fourth and Fifth Causes of Action for Tortious Interference

Plaintiff alleges in his Complaint that Defendants Hassett and Berger tortiously interfered with his employment agreement. Compl. ¶¶ 107-113.  Defendants argue that, as a signatory to the employment agreement, Dr. Hassett was not a third party who can be held liable for tortious interference with that agreement.  (Def's Mem of Law, Docket No. 82, at 22-25).  Defendants further argue that there is no evidence of fraud or deceit on the part of Dr. Berger.  Id. at 25.  Plaintiff responds that Dr. Hassett's actions after the Level III Grievance decision were improper and outside the scope of his authority, and similarly that Dr. Berger's actions and inactions constituted a knowing and intentional inducement to the breach of Plaintiff's contract.  (Pl's Mem of Law in Opp'n, Docket No. 94-7, at 19-23).

"Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996), citing Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120 (N.Y. 1956).  Generally, a signatory may not be held liable for tortious interference with a contract, inasmuch as a plaintiff's cause of action against the signatory would be for the breach of the contract

19

itself, not the inducement thereof. Ryan v Brooklyn Eye & Ear Hosp., 46 A.D.2d 87, 90 (N.Y. App Div 2d Dep't 1974)("if one has an action for breach of contract, he should not also have a cause of action for inducement to breach against the same defendant"); see Shea v. Hambro Am., 200 A.D.2d 371, 372 (1st Dep't 1994).   Plaintiff argues that Dr. Hassett signed the employment agreement as an agent of UB and/or UMRS.  An agent or employee of a contracting party may be held liable for tortious interference with an existent contract where it is established that the agent acted outside the scope of his or her authority. Finley, 79 F.3d at 1295; Kosson v. Algaze, 203 A.D.2d 112, 113 (N.Y. App Div 1st Dep't 1994), affd 84 N.Y.2d 1019 (N.Y. 1995).  Actions deemed to be outside the scope of authority include those that are committed independently for personal pecuniary gain, Cohen v. Davis, 926 F.Supp 399, 405 (S.D.N.Y. 1996); BIBConstr. Co. Inc. v. City of Poughkeepsie, 204 A.D.2d 947 (N.Y. App Div 3d Dep't 1994); Bank of New York v. Berisford Int'l, 190 A.D.2d 622, 622 (N.Y. App Div 1st Dep't 1993) or are derived solely from malice.  Lerman v Me. Assocs. of Woodhull, P.C., 160 A.D.2d 838, 839 (N.Y. App Div 2d Dep't 1990); Bonanni v. Straight Arrow Publishers, Inc., 133 A.D.2d 585, 586-587 (N.Y. App Div 1st Dep't 1987).  In other words, there must be evidence from which the trier of fact can infer that a defendant "used fraud, misrepresentation, deceit or other tortious means, or that he acted purely from malice." Bonanni, 133 A.D.2d at 586 -587.

Here, Dr. Hassett was at all relevant times the Residency Program Director for UB's Department of Surgery Residency Program. (Hassett Decl. ¶ 1).  Pursuant to Plaintiff's employment contract, the Program Director has the power to terminate Plaintiff's employment, (Compl. Ex. A), and by all evidence in the record, has the authority to oversee Plaintiff's placement in an affiliated hospital for the relevant training rotations.  Plaintiff has

not pointed to any action by Dr. Hassett in connection with the non-renewal of the employment agreement which would fall outside the scope of that authority or any evidence that would support an inference that Dr. Hassett acted solely out of malice.  As previously noted, there is significant evidence in this record regarding the concerns expressed and discussed with Plaintiff regarding his professionalism and clinical skills that, although it does not excuse UMSR's failure to abide by the Level III grievance determination, nonetheless belies an argument that Dr. Hassett acted arbitrarily or with malice. Similarly, there is no evidence to support Plaintiff's assertion that Dr. Hassett's communications with ECMC and Kaleida Health were anything but a regular part of his duties as Program Director.  (See Pl's Mem of Law in Opp'n, Docket No. 94-7, at 21).  In the absence of evidence that Dr. Hassett did not act in good faith and instead committed independent torts or predatory acts, BIB Const. Co. Inc., 204 A.D.2d at 948, Plaintiff's remedy lies in his breach of contract cause of action. see Shea, 200 A.D.2d at 372; Ryan, 46 AD2d at 90.

The same conclusion must be reached with respect to Defendant Berger.  Plaintiff alleges that Dr. Berger failed to direct Dr. Hassett to fully reinstate Plaintiff.  Pl's Mem of Law in Opp'n at 22-23. Implicit in this argument is that Dr. Berger had the authority to do so, therefore that action or inaction would fall within the scope of her authority as the Senior Associate Dean for Graduate Medical Education at UB.  Plaintiff points to no evidence from which it can be inferred that Dr. Berger intentionally and maliciously prevented Plaintiff's reinstatement, such that she could be found liable for tortious interference.

Plaintiff further claims that these Defendants tortiously interfered with his

21

prospective economic relations by publishing false and misleading statements to the residency programs to which Plaintiff applied for transfer. (Compl. ¶¶ 114-120, Pl's Mem of Law in Opp'n, Docket No. 94-7, at 23-24). "[T]he tort of interfering with prospective contractual relationships has more demanding requirements for establishing liability than those required for existing contractual relationships." Perry v. Int'l Transport Workers' Fed., 750 F.Supp 1189, 1207 (S.D.N.Y. 1990). Tortious interference with business relations arises in " 'those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant.' " Morrow v. MVP Health Plan, Inc., 307 A.D.2d 627, 628 (N.Y. App Div 3d Dep't 2003), quoting M.J. & K. Co., Inc., v. Matthew Bender and Co., Inc., 220 A.D.2d 488, 490 (N.Y. App Div 2d Dep't 1995). To establish this cause of action a plaintiff has the burden of establishing that the motive for the interference was solely malicious. M.J. & K. Co., Inc., 220 A.D.2d at 490.

Plaintiff argues that Dr. Hassett "falsely and maliciously claimed" that Plaintiff had been released from the residency program in letters of recommendation in support of Plaintiff's candidacy for other residency programs. (Pl's Mem of Law in Opp'n, Docket No. 94-7, at 24; Fleming Aff. Ex EE (recommendation letters)). Those recommendation letters state that Plaintiff's contract was not renewed "for a couple of reasons," including concerns regarding maturity, patient management, and clinical judgment. (Fleming Aff. Ex EE). These general statements are not only supported by the record here, but were also offset by Hasset's clear statement in those letters that he was supporting Plaintiff's candidacy for the residency programs. Id. Hassett also included additional paragraphs specifically detailing Plaintiff's successes such as publications and academic awards. Id. Moreover,

22

even if these letters of recommendation were sufficient to raise an issue regarding malicious intent, summary judgment in Defendants' favor on this issue would still be warranted, inasmuch as Plaintiff failed "to submit evidence that there was 'a reasonable certainty' a contract would have been entered into but for the defendant's interference." Long Island Univ. v. Grucci For Congress, Inc., 10 A.D.3d 412, 413 (N.Y. App Div 2d Dep't 2004), citing Union Car Advertising Co. v. Collier, 263 N.Y. 386, 401 (N.Y. 1934). Accordingly, Defendants Hassett and Berger are granted summary judgment on Plaintiff's fourth and fifth causes of action against them for tortious interference.

## IV.  CONCLUSION

For the forgoing reasons, the Complaint is dismissed in its entirety against Defendant Siebel due to Plaintiff's failure to timely move for substitution.  Plaintiff is granted summary judgment on his second and third causes of action against UMRS and Defendants Hassett and Berger in their official capacities only, and that part of Plaintiff's motion seeking reinstatement is also granted.  Defendants Hassett and Berger are granted summary judgment with respect to the second, fourth and fifth causes of action asserted against them in their individual capacities.  UMRS' motion for summary judgment is denied in its entirety.

## V.  ORDERS

IT IS HEREBY ORDERED that Defendant UMRS' Motion for Summary Judgment (Docket No. 76) is DENIED;

FURTHER, the Motion for Summary Judgment of Defendants Berger and Hassett (Docket No. 78) is GRANTED IN PART and DENIED IN PART;

23

FURTHER, Plaintiff's Motion for Partial Summary Judgment (Docket No. 83) is GRANTED IN PART and DENIED IN PART;

FURTHER, Defendants UMRS, Hassett, and Berger are directed to reinstate Plaintiff as a PGY3 resident on probation;

SO ORDERED.

Dated:  March 18, 2012
           Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Judge